**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

MID-AM BUILDING SUPPLY, INC.,    )
    )
           Plaintiff,    )
    )
      v.    )    Case No. 11-4167-KGS
    )
SCHMIDT BUILDERS SUPPLY,    )
INC., *et al*.    )
    )
          Defendants.    )

## MEMORANDUM AND ORDER

This case involves a dispute between Plaintiff Mid-Am Building Supply, Inc. ("Mid-Am") and Defendant Schmidt Builders Supply, Inc. ("Schmidt") arising from Schmidt's failure to pay for building supplies purchased from Mid-Am and the failure of Defendants John Duncan and Mary Duncan (collectively "the Duncans") to pay Mid-Am as guarantors of Schmidt's account obligations. This matter comes before the Court upon Plaintiff's Motion for Summary Judgment (ECF No. 30) and Defendants Cross-Motion for Summary Judgment (ECF No. 35). For the reasons set forth below, Plaintiffs' Motion for Summary Judgment is granted in part and denied in part and Defendants' Cross-Motion for Summary Judgment is denied.

### I.    Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[1] When applying this standard, a court views the evidence and all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.[2] A factual dispute is "material" if,

---

[1] Fed. R. Civ. P. 56(a).

[2] *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc*., 912 F.2d 1238, 1241 (10th Cir. 1990) (citing *Gray v. Phillips Petroleum Co.*, 858 F.2d 610, 613 (10th Cir. 1988).

under the applicable substantive law, it is "essential to the proper disposition of the claim."[3] "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[4] A court will not take into account factual disputes that are irrelevant or unnecessary.[5] A "genuine" issue of fact exists where "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[6]

The legal standard for summary judgment does not change if the parties file cross-motions for summary judgment. "Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another."[7] "To the extent the cross-motions overlap, however, the court addresses the legal arguments together."[8] Additionally, when cross-motions for summary judgment are filed, the court is "entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts."[9]

---

[3] *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).

[4] *Anderson*, 477 U.S. at 248.

[5] *Id.*

[6] *Adler*, 144 F.3d at 670 (citing *Anderson*, 477 U.S. at 248).

[7] *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) (citing *SEC v. Am. Commodity Exch., Inc.*, 546 F.2d 1361, 1365 (10th Cir. 1976); Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2720, at 464 (1973)).

[8] *Tri-State Truck Ins., Ltd. v. First Nat'l Bank of Wamego*, No. 09-4158-SAC, 2011 WL 3349153, at *1 (D. Kan. Aug. 3, 2011).

[9] *James Barlow Family Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997), *cert. denied*, 523 U.S. 1048 (1998) (citing *Harrison W. Corp. v. Gulf Oil Co.*, 662 F.2d 690, 692 (10th Cir. 1981)).

Each party must establish the lack of a genuine issue of material fact and the entitlement to a judgment as a matter of law.[10] To meet this standard, the movant bears the initial burden.[11] Nonetheless, a "movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim."[12]

If the movant carries this initial burden, the burden shifts to the nonmovant to "set forth specific facts showing that there is a genuine issue for trial."[13] The nonmovant may not rest on mere allegations or denials of its pleading.[14] Rather, the nonmovant must give "specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[15] "Conclusory and self-serving affidavits are not sufficient" to show disputed material facts.[16] In addition, the nonmovant cannot rely "on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial."[17]

---

[10] *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[11] *Adler*, 144 F.3d at 671 (citing *Celotex Corp.*, 477 U.S. at 323).

[12] *Am. Multi-Cinema, Inc. v. Southroads, L.L.C.*, 115 F. Supp. 2d 1257, 1261 (D. Kan. 2000) (citing *Adler*, 144 F.3d at 671).

[13] *Anderson*, 477 U.S. at 256; *see also Adler*, 144 F.3d at 671 n.1 (discussing burden shifting for a motion for summary judgment).

[14] *Anderson*, 477 U.S. at 256.

[15] *Adler*, 144 F.3d at 671.

[16] *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991).

[17] *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988) (citing *Bryant v. O'Connor*, 848 F.2d 1064, 1067 (10th Cir. 1988)).

The Court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[18]

In diversity cases such as this, "the substantive law of the forum state governs the analysis of the underlying claims, including specification of the applicable standards of proof, but federal law controls the ultimate, procedural question whether judgment as a matter of law is appropriate."[19] Therefore, the substantive law of Kansas applies and governs this case.

## II.    Statement of Material Facts

The essential facts from the parties' summary judgment motions are uncontroverted. Mid-Am is a Missouri corporation in the business of, among other things, selling building supply materials. Schmidt is a Kansas corporation that operated a construction supply business since its incorporation in 1946. Schmidt purchased goods on credit from Mid-Am for approximately three decades. John and Mary Duncan are individuals who reside in Kansas and were employees of Schmidt during the events that are relevant to this lawsuit.

On January 23, 2009, Schmidt executed an Application for Credit with Mid-Am. On May 26, 2011, Schmidt executed another Application for Credit ("May 26, 2011 Credit Account Agreement") with Mid-Am. As part of the May 26, 2011 Credit Account Agreement, the Duncans executed personal guaranties, effective May 26, 2011, guarantying the repayment of Schmidt's account held by Mid-Am. The parties agree that the May 26, 2011 Credit Account Agreement and the personal guaranties are binding and valid contracts.

---

[18] *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[19] *Haberman v. The Hartford Ins. Grp.*, 443 F.3d 1257, 1264 (10th Cir. 2006).

As part of the agreement between the parties, Mid-Am would sell building supply materials to Schmidt on credit. In return, Schmidt agreed to pay the purchase price of the products it received. Any past due amounts were subject to late charges at the rate of 1.5% per month (18% per annum). In addition, Schmidt and the Duncans agreed to pay Mid-Am all costs of collection, including reasonable attorney fees.

The transactions commenced when Schmidt would place a request with Mid-Am for building supply materials, resulting in Mid-Am shipping those products to Schmidt. After the products were delivered to and accepted by Schmidt, Mid-Am's delivery driver would return a delivery ticket to Mid-Am for billing purposes. Mid-Am would then issue invoices to Schmidt for the delivered goods. The parties do not dispute that all conditions precedent to Schmidt's and the Duncans' performance were satisfied when Mid-Am delivered the products. Further, the parties agree that the products were delivered undamaged, in compliance with the specification of Schmidt's order, and in merchantable condition. The total amount of unpaid invoices for products delivered to Schmidt is $445,739.45.

In addition to Schmidt's agreements with Mid-Am, Kaw Valley Bank was a secured lender to Schmidt with a perfected security interest in Schmidt's inventory. Mid-Am did not perfect its security interest in the inventory it sold to Schmidt. On July 19, 2011, Kaw Valley Bank and Schmidt entered into a surrender in lieu of foreclosure agreement (titled "settlement agreement"). The settlement agreement required Schmidt to surrender all of its assets to Kaw Valley Bank and terminated Schmidt's business operations. Kaw Valley Bank subsequently liquidated Schmidt's assets, including inventory supplied by Mid-Am and other suppliers. As a result of the settlement agreement, the Duncans were effectively removed as employees of Schmidt. Schmidt asserts that the actions taken by Kaw Valley Bank caused it to default on

obligations owed to its suppliers and resulted in numerous lawsuits filed against Schmidt and the Duncans.

At the time the parties entered into their agreements, they did not know that Kaw Valley Bank might take over Schmidt's assets and close its business. Such a possibility was first raised with the issuance of loan default letters on July 15, 2011, and a subsequent demand for additional collateral as an alternative to foreclosure.

 On July 27, 2011, Mid-Am sent Schmidt and the Duncans a demand for adequate assurance of payment. On August 3, 2011, counsel for Mid-Am sent Schmidt and the Duncans a demand for payment on all obligations owed for products delivered to Schmidt. The parties do not dispute that Schmidt failed to pay for the products within the terms of its agreement with Mid-Am. In addition, the Duncans admit that their obligations under the personal guaranties they signed with Mid-Am were not paid.

Mid-Am claims that the total amount Schmidt owes Mid-Am for unpaid invoices equals $455,739.49. Of that amount, Mid-Am claims it delivered products to Schmidt totaling $391,295.45 after the May 26, 2011 Credit Account Agreement and the personal guaranties were signed by the parties. Schmidt and the Duncans claim that the unpaid balance on Schmidt's account held by Mid-Am for invoices between May 27, 2011, and July 19, 2011, equals $376,767.71. Mid-Am claims the difference between the parties' calculations is based upon a delivery made on July 19, 2011, which was not invoiced until July 20, 2011.

Prior to July 19, 2011, Schmidt claims it continued to make substantial payments on its account with Mid-Am, including a check for $101,057.00 issued on July 15, 2011. The check issued on July 15, 2011, however, was dishonored and returned to Mid-Am unpaid.

### III.    Analysis

In this case, Mid-Am asserts several causes of action against Defendant Schmidt including breach of contract (Count II), action on account (Count I), and unjust enrichment (Count IV). Mid-Am asserts a cause of action against Defendants John and Mary Duncan for breach of guaranty (Count III). Mid-Am also seeks prejudgment interest and recovery of its costs of collection, including reasonable attorney's fees. Schmidt and the Duncans do not deny the claims for breach of contract, breach of guaranty, and action on account. Rather, Schmidt and the Duncans rely on the affirmative defenses of impossibility of performance and frustration of purpose to excuse their contractual obligations. The parties filed cross-motions for summary judgment on all claims and, therefore, the Court will address each claim in turn.

### A.  Breach of Contract Against Defendant Schmidt (Count II)

Under Kansas law, the essential elements of a breach of contract action are: 1) the existence of a contract between the parties; 2) sufficient consideration to support the contract; 3) the plaintiff's performance or willingness to perform in compliance with the contract; 4) the defendant's breach of the contract; and 5) damages to plaintiff caused by the breach.[20]

In this case, Defendant Schmidt does not dispute the first four elements of Mid-Am's breach of contract claim. Schmidt admits a contract existed when it entered into the Credit Account Agreement with Mid-Am on May 26, 2011, promising to pay Mid-Am for products that it ordered and received on credit. Schmidt also does not dispute the sufficiency of consideration to support the contract. In Kansas, consideration exists when something of value is bargained for and given in exchange for a promise.[21] The term "something of value" may consist of a promise

---

[20] PIK Civ. 4th 124.01-A; *Commercial Credit Corp. v. Harris*, 510 P.2d 1322, 1325 (Kan. 1973).

[21] PIK-Civil 4th 124.12.

(e.g. as a promise to pay money), an act (e.g. such as the payment of money), or a forbearance (e.g. such as forbearance to sue).[22] Here, sufficient consideration existed when Mid-Am delivered products to Schmidt and Schmidt promised to repay Mid-Am for its purchases. Mid-Am performed on the contract when it delivered the products to Schmidt at Schmidt's request. Finally, Schmidt breached the contractual agreement when it failed to pay Mid-Am for its purchases. Based on these undisputed facts, the Court finds that the first four elements of Mid-Am's breach of contract claim to be satisfied. Nevertheless, Schmidt relies on the affirmative defenses of impossibility of performance and frustration of purpose to relieve its contractual obligation with Mid-Am. Schmidt and the Duncans also dispute the amount of damages Mid-Am suffered as a result of the breach of May 26, 2011 Credit Account Agreement. The Court will first address Schmidt's affirmative defenses.

Schmidt and the Duncans' brief appears to combine the defenses of impossibility and frustration of purpose together. These two affirmative defenses, however, are distinct from each other.[23] Nonetheless, the determination of whether the affirmative defenses will excuse Schmidt's contractual breach is one of law, not fact.[24] Accordingly, the Court will address these

---

[22] *Id.*

[23] *See T.S.I. Holdings, Inc. v. Jenkins*, 924 P.2d 1239, 1247 (Kan. 1996) (noting that there is a difference between impracticability of performance, also known as impossibility, and frustration of purpose) (citing *Columbian Nat'l Title Ins. Co. v. Twp. Title Servs., Inc.*, 659 F. Supp. 796, 802-04 (D. Kan. 1987)); *see also Butler Mfg. Co. v. Americold Corp.*, 850 F. Supp. 952, 956 (D. Kan. 1994) ("Although some Kansas cases treat the doctrines of impracticability[, also known as impossibility,] and frustration as if they are one, it is clear that they are based on different assumptions and are comprised of different elements."). The Court also notes that several Kansas cases combine the terms together but, out of an abundance of caution, the Court will address each defense separately. *See generally T.S.I. Holdings, Inc.*, 924 P.2d 1239; *Unique Designs, Inc. v. Dargal Clark Builders, Inc*., 272 P.3d 624 (Kan. Ct. App. 2012).

[24] *See Columbian Nat'l Title Ins.*, 659 F. Supp. at 802 (citing Restatement (Second) of Contracts Ch. 11, Introductory Note at 310; E. Farnsworth, Contracts § 9.7 at 691; *Sunflower Electric Coop., Inc. v. Tomlinson Oil Co.*, 638 P.2d 963, 969 (Kan. Ct. App. 1981).

affirmative defenses separately to determine, as a matter of law, whether either party should be granted summary judgment on Mid-Am's breach of contract claim.

### i.   *Impossibility of Performance*

Kansas has long recognized that the defense of impossibility, or more modernly described as impracticability of performance,[25] may relieve a promisor's liability for breach of contract.[26] "[I]mpracticability may arise after the contract, in which case it is referred to as 'supervening' or may exist at the time of the contract, in which case it is referred to as 'original' or 'existing.'"[27] In this case, Schmidt argues that after it entered into its agreement with Mid-Am, Kaw Valley Bank compelled the surrender of Schmidt's assets and closed its business, making it impossible for Schmidt to make further payments to Mid-Am.[28] Therefore, because the alleged impracticability occurred after the creation of the contract between Schmidt and Mid-Am, the Court will examine the affirmative defense as supervening impracticability.

Kansas courts have relied on the Restatement (Second) of Contracts (1981) for the general rule concerning discharge by supervening impracticability.[29] Restatement (Second) of Contracts § 261 states:

---

[25] *See Sunflower Electric Coop., Inc.*, 638 P.2d at 969; *see also* Restatement (Second) of Contracts § 261 cmt. d (1981). Comment d states:

> Although the rule stated in this Section is sometimes phrased in terms of "impossibility," it has long been recognized that it may operate to discharge a party's duty even though the event has not made performance absolutely impossible. This Section, therefore, uses "impracticable," the term employed by Uniform Commercial Code § 2-615(a), to describe the required extent of the impediment to performance.

*Id.* The Court notes that for clarity purposes it will refer to the doctrine of impossibility as impracticability.

[26] *Sunflower Elec. Coop.*, 638 P.2d at 969. Even though Kansas has long recognized the doctrine of impracticability, it has infrequently applied the doctrine. *See T.S.I. Holdings, Inc.*, 924 P.2d at 1248.

[27] *Sunflower Elec. Coop.*, 638 P.2d at 969.

[28] Defs.' Resp. to Mot. for Summ. J. at 5, ECF No. 35.

[29] *See T.S.I. Holdings, Inc.*, 924 P.2d at 1247-48; *Sunflower Elec. Coop.*, 638 P.2d at 969-71; *see also Columbian Nat'l Title Ins. Co.*, 659 F. Supp. at 802-03.

Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

In large part, the Restatement Rule adopts the rationale of section 2-615 of the Uniform Commercial Code ("UCC") and its Kansas equivalent, K.S.A. § 84-2-615.[30] The UCC's Kansas equivalent applies to this case because the sale of building materials is defined as a sale of goods.[31]

Kansas courts recognize "the important distinction between subjective ('I cannot do it') and objective ('the thing cannot be done') impracticability."[32] "Only objective impracticability may serve to relieve a party of a contractual obligation."[33] Thus, "where the promisor agrees to perform an act possible in itself, he will be liable for a breach of the contract even though contingencies not foreseen by him arise that make it difficult or even beyond his power to perform and which might have been provided against in the agreement."[34] The Court notes that

---

[30] *See* K.S.A. § 84-2-615.
> Except so far as a seller may have assumed a greater obligation . . . (a) Delay in delivery or nondelivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made . . . .

*Id.*

[31] *See* K.S.A. § 84-2-105, 84-2-106.

[32] *T.S.I. Holdings, Inc.*, 924 P.2d at 1248 (citing *Freeto v. State Highway Comm'n*, 166 P.2d 728, 762 (Kan. 1946)); *see McElroy Metal Mill, Inc. v. Safeco Ins. Co. of Am.*, No. 05-4032-JAR, 2006 WL 2403182, at *2 (D. Kan. Aug. 14, 2006).

[33] *T.S.I. Holdings, Inc.*, 924 P.2d at 1248 (citing *Sunflower Electric Coop., Inc.*, 638 P.2d at 970).

[34] *Columbian Nat. Title Ins. Co.*, 659 F. Supp. at 802 (citing *White Lakes Shopping Ctr., Inc. v. Jefferson Standard Life Ins. Co.*, 490 P.2d 609, 610 (Kan. 1971)).

most of the Kansas cases which have considered the doctrine of impracticability were found to involve subjective impossibility and thus relief was denied.[35]

The supervening event Schmidt relies upon to justify excusing its contractual obligation to Mid-Am is the alleged forced closure of Schmidt by Kaw Valley Bank. Schmidt argues that once it entered into the settlement agreement with Kaw Valley Bank, Schmidt or anyone else in its situation could no longer generate funds to pay Mid-Am. Schmidt argues that Kaw Valley Bank forced it to enter into this agreement while under duress.[36] Schmidt, however, fails to show why it was legally obligated to enter into the contract with the bank. Regardless, Schmidt fails to show that paying Mid-Am for purchased building materials was not possible, as required under the objective standard. In fact, others in a similar situation may have refrained from entering into a settlement agreement with Kaw Valley Bank, which may have allowed Schmidt to satisfy its obligation to Mid-Am. Therefore, the Court finds that Defendant Schmidt's alleged impracticability to be subjective. A failure to show objective impracticability is sufficient to defeat relief under the impracticability doctrine.[37]

Even if the Court were to find this case involved objective impracticability, Schmidt still does not provide sufficient evidence to carry its burden to support this affirmative defense.

---

[35] *Sunflower Electric Coop., Inc.*, 638 P.2d at 970. *Sunflower Electric Coop., Inc.* provides several examples in which the court has found subjective impracticability: *Wichita Props. v. Lanterman*, 633 P.2d 1154 (1981) (inability to obtain liquor license); *Meyer v. Diesel Equip. Co.*, 570 P.2d 1374 (Kan. Ct. App. 1977) (difficulty in securing parts); *Bailey v. Talbert*, 294 P.2d 220 (Kan. 1956) (inability to transfer franchise); *Freeto*, 166 P.2d 728 (Kan. 1946) (inability to complete construction project due to war related labor and equipment shortages); *Int'l Trading & Rice Corp. v. Benscheidt*, 41 P.2d 737 (Kan. 1935), (unprofitability of purchasing sugar for alcohol manufacture after alcohol permit revoked); *City of Topeka v. Indus. Gas Co.*, 11 P.2d 1034 (1932) (inability to obtain certificate to do business); *W. Drug Supply Co. of Kansas City, MO v. Bd. of Admin.*, 187 P. 701 (Kan. 1920) (inability to furnish supplies after judicial sale of plaintiff's assets).

[36] Schmidt and the Duncans state they were under duress when they entered into the settlement agreement because of Kaw Valley Bank's "declaration of default on several loans coupled with a demand by the bank for additional collateral which Schmidt and the Duncans were unable to provide." Defs.' Resp. to Mot. for Summ. J. at 2, ECF No. 35.

[37] *Columbian Nat'l Title Ins. Co.*, 659 F. Supp. at 803 (citing *Sunflower Electric Coop., Inc.*, 638 P.2d at 970).

Schmidt fails to establish the non-occurrence of the supervening event was a basic assumption on which the contract was made. Schmidt argues that neither party would have entered into a contractual relationship on the assumption that the bank would later close Schmidt's business. However, "[t]he continued existence of certain market conditions or the financial conditions of the parties is ordinarily not such an assumption."[38] As a result, "market shifts or the financial inability of the promisor does not usually result in discharge under the doctrine of impracticability."[39] Therefore, Schmidt's financial inability to pay both Kaw Valley Bank and Mid-Am, eventually leading to its closure, should not be considered a basic assumption of the contract.

Schmidt also fails to establish that the closure of its business was unforeseeable and not an assumed risk. When examining foreseeability and assumption of risk under the doctrine of impracticability, "the language or circumstances of a contract may indicate that a party has assumed an obligation to perform despite impracticability."[40] "When the contingency in question is sufficiently foreshadowed at the time of contracting, the contingency may be considered among the business risks that are regarded as part of the negotiated terms of the contract, either consciously or as a matter of reasonable, commercial interpretation from the circumstances."[41] "A similar argument prevents application of the defense where the promisor, although having no power to prevent the contingency, had superior knowledge of the possibility of its happening."[42]

---

[38] *Id.* (citing Restatement (Second) of Contracts § 261 cmt. b).

[39] *Id.* (citing Restatement (Second) of Contracts § 261 cmt. b).

[40] *Sunflower Electric Coop., Inc.*, 638 P.2d at 972.

[41] *Columbian Nat'l Title Ins. Co.*, 659 F. Supp. at 803.

[42] *Id.* at 803 (citing *Sunflower Electric Coop., Inc.*, 638 P.2d at 972; 18 Williston on Contracts § 1953, p. 118 (3d ed. 1978)).

One example of a foreseeable supervening event can be found in *Western Drug Supply & Specialty Co. of Kansas City, Missouri v. Board of Administration of Kansas*.[43] In that case, the Kansas Supreme Court held that a supplier's failure to deliver goods under the terms of a contract was not excused under the doctrine of impracticability because it is reasonably foreseeable that a creditor may file a lawsuit against a debtor causing the debtor's assets to be sold.[44]

Schmidt argues that the closure of its business was unforeseeable when it contracted with Mid-Am because Schmidt was unaware of its financial problems with Kaw Valley Bank until July 15, 2011, the day it first received loan default letters from Kaw Valley Bank. Schmidt, however, was in the business of supplying construction materials from 1946 to 2011 and, therefore, likely has superior knowledge about its industry's market conditions, its own financial situation, and its debt held by Kaw Valley Bank and other creditors. Thus, the possibility that Schmidt's business would close due its financial inability to make payments to creditors was likely foreseeable to a company with Schmidt's superior knowledge. Further, like the foreseeability of the supplier's assets being sold in *Western Drug Supply & Specialty Co. of Kansas City, Missouri*, it is foreseeable that if a debtor, like Schmidt, does not pay its creditors, the debtor's assets could be sold, its inventory held subject to a security interest could be foreclosed upon, and its business could be closed. The Court finds that Defendant Schmidt failed to show the closure of its business was unforeseeable or the risk thereof was not assumed.

Based on the foregoing reasons and after a thorough review of the parties' briefs, the Court finds that Defendant Schmidt fails to present sufficient evidence on its impossibility/impracticability defense to excuse its liability for breach of contract.

---

[43] 187 P. 701 (Kan. 1920).

[44] *Id.* at 703-04.

### ii.    *Frustration of Purpose*

As an initial matter, Schmidt and the Duncans' Answer did not plead frustration of purpose as a defense to Mid-Am's claims. Fed. R. Civ. P. 8(c) states that "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense." Rule 8 enumerates some, but not all, affirmative defenses. An affirmative defense is a "defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's . . . claim, even if all the allegations in the complaint are true."[45] Frustration of purpose is an affirmative defense because, if true, the doctrine would excuse a claim for breach of contract.[46]

Generally, if a defendant does not plead an affirmative defense in its responsive pleading, the affirmative defense is deemed waived and may not be considered a triable issue.[47] Strict adherence to pleading affirmative defenses in a responsive pleading may be excused if the purpose of Rule 8(c) has been otherwise fulfilled.[48] The Tenth Circuit "has held that the purpose behind [R]ule 8(c) is that of putting plaintiff on notice well in advance of trial that defendant intends to present a defense in the nature of an avoidance."[49] Therefore, under certain

---

[45] *Bowers v. Mortg. Elec. Registration Sys.*, No. 10-4141-JTM-DJW, 2011 WL 2149423, at *4 (quoting *U.S. v. Portillo-Madrid*, 292 Fed. App'x. 746, 747 n.1 (10th Cir. 2008)).

[46] *See Columbian Nat'l Title Ins. Co.*, 659 F. Supp. at 804 (citing *Berline v. Waldschmidt*, 156 P.2d 865, 867-68 (Kan. 1945); *see also Burlington N. & Santa Fe Ry. Co. v. Kansas City S. Ry. Co.*, 45 F. Supp. 2d 847, 851 (D. Kan. 1999) (describing commercial frustration as an affirmative defense).

[47] *See Bentley v. Cleveland Cnty. Bd. of Cnty. Comm'rs*, 41 F.3d 600, 604 (10th Cir. 1994); *Radio Corp. of Am. v. Radio Station KYFM, Inc.*, 424 F.2d 14, 17 (10th Cir. 1970).

[48] *See Ahmad v. Furlong*, 435 F.3d 1196, 1201 (10th Cir. 2006) (noting that most courts permit a defendant to raise an affirmative defense for the first time in a post-answer motion if the delay does not prejudice the opposing party).

[49] *Ball Corp. v. Xidex Corp.*, 967 F.2d 1440, 1443-44 (10th Cir. 1992) (internal quotation marks and brackets omitted).

circumstances an affirmative defense may be raised for the first time in a summary judgment motion if the delay does not prejudice the plaintiff.[50]

In this case, the Court finds that little to no prejudice will occur by allowing Defendants to raise the defense of frustration of purpose in its current summary judgment motion. Mid-Am has fully addressed the defense of frustration of purpose in their reply brief and has not claimed any prejudice by Schmidt and the Duncans' delayed assertion. In addition, due to the Mid-Am's extensive arguments opposing this affirmative defense, it appears that discovery relating to frustration of purpose has taken place. Because the delay unlikely prejudices Mid-Am, the Court finds that Schmidt and the Duncans' failure to plead the affirmative defense of frustration of purpose in their Answer does not constitute a waiver. The Court will consider Defendants' affirmative defense of frustration of purpose.

Kansas courts have relied on Restatement (Second) of Contracts § 265 (1981) for the general rule of the frustration of purpose doctrine.[51] Section 265 states:

> Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.

Frustration of purpose excuses breach of contract only "where the object or purpose of a contract is frustrated or its enjoyment prevented by law."[52] "The doctrine is predicated upon the premise that the breaching party could not reasonably protect itself against contingencies that

---

[50] *See generally Ahmad*, 435 F.3d at 1201-03.

[51] *See State v. Boley*, 113 P.3d 248, 253 (Kan. 2005) (applying the principles of contract law to criminal plea agreements); *Columbian Nat'l Title Ins. Co.*, 659 F. Supp. at 803-04.

[52] *Berline*, 156 P.2d at 867; *see Columbian Nat'l Title Ins. Co.*, 659 F. Supp. at 804.

later arose."[53] "Consequently, the doctrine never applies 'where the risk of the event that has supervened to cause the alleged frustration was reasonably foreseeable, and could and should have been anticipated by the parties and provision made therefor within the four corners of the agreement.'"[54] If the supervening event appears to have been reasonably foreseeable and controllable by the parties, the breaching party may not successfully invoke the defense, and the contract is enforceable.[55] Further, unlike the doctrine of impracticability, "[u]nder the doctrine of frustration, performance remains possible, but is excused because a fortuitous event supervenes to cause a failure of the consideration or a practically total destruction of the expected value of the performance."[56]

In *State v. Boley*, the Kansas Supreme Court analyzed the doctrine of frustration of purpose using a three-element approach enumerated in the Restatement (Second) of Contracts § 265, comment a.[57] The first element examines whether the frustrated purpose was "so completely the basis of the contract that . . . without it the transaction would make little sense."[58] The second element of the doctrine requires the frustration to be substantial.[59] "It is not enough that the transaction has become less profitable for the affected party or even that [it] will sustain a loss. The frustration must be so severe that it is not fairly to be regarded as within the risks . . .

[53] *Columbian Nat'l Title Ins. Co.*, 659 F. Supp. at 804 (citing *Berline*, 156 P.2d at 868); *see State ex rel. Stephan v. Kansas Racing Comm'n*, 792 P.2d 971, 983 (Kan. 1990).

[54] *Columbian Nat'l Title Ins. Co.*, 659 F. Supp. at 804 (citing *Berline*, 156 P.2d at 867); *see State ex rel. Stephan*, *792* P.2d at 983.

[55] *Columbian Nat'l Title Ins. Co.*, 659 F. Supp. at 804 (citing *Berline*, 156 P.2d at 868); *see State ex rel. Stephan*, 792 P.2d at 983.

[56] *Columbian Nat'l Title Ins. Co.*, 659 F. Supp. at 804.

[57] *See Boley*, 113 P.3d at 253-55.

[58] *Id.* at 253-54 (citing Restatement (Second) of Contracts § 265, comment a).

[59] *Id.* at 254 (citing Restatement (Second) of Contracts § 265, comment a).

assumed under the contract."[60] The third and final element requires that the "non-occurrence of the frustrating event must have been a basic assumption on which the contract was made."[61]

In this case, Schmidt argues that the closure of its business by Kaw Valley Bank was "equivalent to total destruction of the business by a bomb or Act of God" and made it impossible for it to make payments on unpaid invoices. Schmidt, however, fails to show that the doctrine of frustration of purpose applies because the closure of its business did not eliminate the consideration of the contract. As previously stated, consideration exists when something of value is bargained for and given in exchange for a promise.[62] Here, consideration existed when Mid-Am delivered at least $455,739.49 worth of products to Schmidt and Schmidt promised to pay Mid-Am for its purchases. The fact that Schmidt's business was later closed did not impact the consideration of the contract between Schmidt and Mid-Am or destroy the value of the performance.

Schmidt also fails to show the closure of its business was unforeseeable in light of its superior knowledge and the foreseeability that failing to pay a secured creditor may cause the selling off of a debtor's assets and potentially close its business. Moreover, Schmidt fails to provide any evidence that it could not have reasonably protected itself from Kaw Valley Bank taking over its business which led to Schmidt's inability to pay Mid-Am. Because the rationale behind the frustration of purpose doctrine is predicated upon the premise that the breaching party could not reasonably protect itself against unforeseeable supervening contingencies, the Court holds that the frustration of purpose doctrine does not apply.

---

[60] *Id.* at 254.

[61] *Id.* at 255 (citing Restatement (Second) of Contracts § 265, comment a).

[62] PIK-Civil 4th 124.12.

In addition, turning to the third element addressed in *Boley*, the Court finds, as explained above in Section III(A)(*i*), Schmidt fails to establish that the closure of its business was a basic assumption on which the contract was made. The Court finds that Schmidt cannot avoid liability based upon the affirmative defense of frustration of purpose.

### iii.    *Damages*

In this case, there appears to be a genuine material issue of fact regarding the amount of damages suffered by Mid-Am as a result of Schmidt's breach of contract. Schmidt argues that its liability for the May 26, 2011 Credit Account Agreement is limited to the invoices issued after May 26, 2011. Schmidt argues that the total amount it was obligated to pay for products delivered between May 27, 2011, and July 19, 2011, equals $376,767.71.[63] Schmidt calculated this amount from a spreadsheet that totaled the unpaid invoices it received at each of its facilities.[64] Mid-Am, however, contends that the May 26, 2011 Credit Account Agreement applies to products delivered on or after May 26, 2011, to July 19, 2011. Mid-Am claims that the total cost for the products delivered to Schmidt between May 26, 2011, and July 19, 2011, equals $391,295.45.[65] Mid-Am calculated this number by totaling the amount of unpaid invoices from invoice records, delivery tickets, and account statements. Mid-Am alleges that Schmidt and the Duncans incorrectly totaled the amount of delivered products in part because $14,011.08 worth of products were delivered on July 19, 2011, but were invoiced on July 20, 2011.[66] On the evidentiary record presented, the Court concludes a genuine issue of material fact exists regarding the amount of damages to be awarded for Schmidt's breach of the May 26, 2011

---

[63] *See* Defs.' Resp. to Mot. for Summ. J. at ¶ 71; Ex. A-3, ECF No. 35.

[64] *See id.* at Ex. A-3.

[65] *See* Pl.'s Reply Mem. In Supp. of its Mot. for Summ. J. at ¶ 77, ECF No. 39.

[66] *See id.* at ¶ 79.

Credit Account Agreement. The Court is unable to grant summary judgment on this issue.

Therefore, Plaintiff Mid-Am's Motion for Summary Judgment on its claim for breach of contract is granted in part, as to the breach of contract by Defendant Schmidt, and denied in part, as to the *amount* of damages Mid-Am suffered as a result of Schmidt's breach. Further, the Court finds that Defendants' Cross-Motion for Summary Judgment on the claim for breach of contract is denied.

### B. Breach of Guaranty Against Defendants John and Mary Duncan (Count III)

In *Iola State Bank v. Biggs*, the Kansas Supreme Court set forth the law of guaranty as follows:

> The law of guaranty is a part of the law of contracts, a guaranty is a type or kind of contract. For a guaranty there must be at least three parties: a guarantor, a creditor (the individual to whom the promise is made), and a debtor. The guaranty is an obligation collateral to another contractual duty to perform. The contract of the guarantor is a separate contract. It is in the nature of a warranty by the guarantor that the thing guaranteed to be accomplished by the principal shall be done, and is not an engagement jointly with the principal to do the act.[67]

"A guaranty in its technical sense is collateral to the principal contract which is guaranteed; and the guarantor's liability is secondary rather than primary or original."[68] A guaranty must be in writing and signed by the party to be charged.[69] In addition, the guaranty must "state with certainty (1) each party to the contract; (2) the subject matter to which the contract relates; and (3) the terms and conditions of all the promises constituting the contract and by whom and to whom the promises are made."[70] A guarantor may only "be relieved of an obligation to pay if the

---

[67] 662 P.2d 563, 567 (Kan. 1983) (citing *Trego WaKeeney State Bank v. Maier*, 519 P.2d 743, 747 (Kan. 1974).

[68] *Trego WaKeeney State Bank*, 519 P.2d at 747 (citing 38A C.J.S. *Guaranty* § 2, p. 1130).

[69] *Glencore Grain Lit. v. Seaboard Corp.*, 241 F. Supp. 2d 1324, 1332 (D. Kan. 2003) (describing Kansas guaranty law).

[70] *Id.* (citing *Walton v. Piqua State Bank*, 466 P.2d 316, 322 (Kan. 1970)).

debt is extinguished, if there is a valid release or discharge, if a claim against the guarantor is barred by the statute of limitations, or if there is a change in the original contract between the obligor and obligee."[71] The Court considers these standards along with the breach of contract principles in determining whether Mid-Am has established the Duncans' breach of guaranty.

In this case, the Duncans do not dispute they executed valid written guaranties with Mid-Am, effective May 26, 2011, for the payment of all charges incurred by Schmidt under the terms of the May 26, 2011 Credit Account Agreement. On August 3, 2011, counsel for Mid-Am sent the Duncans a demand for payment of Schmidt's unpaid account with Mid-Am. The Duncans failed to make any payment and in turn breached the terms of the guaranty. Moreover, the Duncans fail to offer any evidence indicating their obligation to pay Mid-Am was ever relieved. Thus, based on the foregoing reasons, the Court concludes that the valid guaranty entered into by John and Mary Duncan was breached when the Duncans failed to pay Mid-Am, after a demand for payment, for the outstanding debt in Schmidt's account incurred during the time frame described in the May 26, 2011 Credit Account Agreement. Because the guaranty was valid and breached by the Duncans, the Court next must determine whether Mid-Am suffered damages as a result of the Duncans' breach.

Even though Defendants John and Mary Duncan do not dispute the claim for breach of guaranty, the amount of damages Mid-Am is entitled to recover from the Duncans is predicated on the amount of damages Schmidt owes Mid-Am for the underlying breach of the May 26, 2011 Credit Account Agreement. Because a genuine factual dispute regarding the amount of damages exists on the underlying contract between Schmidt and Mid-Am, as previously discussed, the Court is unable to grant summary judgment on this issue. Therefore, Plaintiff Mid-Am's Motion for Summary Judgment on its claim for breach of guaranty is granted in part, as to the breach of

---

[71] *Iola Sate Bank v. Biggs*, 662 P.2d 563, 571 (Kan. 1983).

guaranty by the Duncans, and denied in part, as to the *amount* of damages Plaintiff Mid-Am suffered as a result of the Duncans' breach. Further, the Court finds that Defendants' Cross-Motion for Summary Judgment on the claim for breach of guaranty shall be denied.

### C. Action on Account Against Defendant Schmidt (Count I)

Under Kansas law, an open account is a written agreement that shows a connected series of debit and credit entries of reciprocal charges and allowances.[72] An open account considers the related individual items of the account to be a continual series of a shifting balance of debits or credits.[73] This balance, however, becomes due when either party at his or her convenience wants to settle and close the account.[74] When this occurs, the liability on the account is no longer divisible amongst the individual items.[75] Rather, there is but one single liability that arises from the series of related individual items.[76]

In *Sheldon Grain & Feed Co. v. Schuetz*, the Kansas Supreme Court summarized the following factors to consider whether an open account exists:

> Generally, a mutual, open, running account, which within the period of limitations draws all items beyond that period into the balance currently owing and due, may arise when a merchant sells merchandise to a customer and extends credit on the sales. Matters such as openness, currency, homogeneity and mutuality should be considered and given weight by the courts in identifying such an account. Openness may be indicated when further dealings between the parties are contemplated and when some term or terms of the sale or sales is left open and undetermined. Currency is indicated when the continuity of the account has not been broken by payment, by the statute of limitation or by change of ownership. Homogeneity generally refers to the nature of the items which make up the

---

[72] *Sheldon Grain & Feed Co. v. Schuetz*, 483 P.2d 1033, 1037 (Kan. 1971).

[73] *Id.*

[74] *Id.*

[75] *Id.*

[76] *Id.*

account, and mutuality refers to the mutuality of dealings between the parties which may give rise to offsetting liabilities.[77]

The transactions in an open account must not be separate, independent, and wholly unrelated.[78] When an open account arises "between two persons, each person does not have a separate cause of action for each separate item of the account, but only the person in whose favor there is a balance due on the account has a cause of action for such balance against the other."[79] Where "the items of asserted indebtedness are all on one side; the account does not have the character of an open running account so far as the statute of limitations is concerned."[80] Kansas case law addresses actions on account primarily in connection with account balances that could potentially be barred by the statute of limitations.[81] The Kansas Supreme Court, however, has held that "[a]n open account is a contractual obligation, once proven."[82]

In this case, it is undisputed by the parties that the account Schmidt held with Mid-Am is an "open account" as defined under Kansas law. Schmidt's account allows for further dealings and a shifting balance by permitting Schmidt to purchase building materials on credit and for Schmidt to make payments for such purchases. In addition, Defendants do not show that the account was broken by payment, statute of limitations, or change of ownership. The transactions involved all related to the selling and purchasing of building materials and, therefore, show

---

[77] *Id.* at 1037-38 (citations omitted).

[78] *See Spencer v. Sowers*, 234 P. 972, 974 (Kan. 1925).

[79] *Shepard v. Klein*, 239 P.2d 930, 932 (Kan. 1952); *see also Bundy v. Liberty Life Ins. Co.*, 95 P.2d 550, 554 (Kan. 1939).

[80] *Yeager v. Nat'l Coop. Refinery Ass'n*, 470 P.2d 797, 801 (Kan. 1970) (citing *Spencer*, 234 P. at 972).

[81] *See generally Sheldon Grain & Feed Co.*, 483 P.2d 1033 (Kan. 1971); *In re Cognasi*, 82 P.3d 532 (Kan. Ct. App. 2004).

[82] *Bloch v. Fedak*, 499 P.2d 1052, 1054 (Kan. 1972) (citing *Spencer*, 234 P. at 972).

homogeneity. Based on the foregoing, the Court finds that Schmidt's account is an open account under Kansas law.

Schmidt relies on the affirmative defenses of impossibility and frustration of purpose to argue that Mid-Am is not entitled to a judgment as a matter of law on this claim. The Court adopts the same reasoning as previously stated in Section III(A) above regarding the Court's discussion on these affirmative defenses and, therefore, the Court finds that Schmidt fails to show that the two affirmative defenses apply here. Because Schmidt refused to pay Mid-Am on its open account and because the affirmative defenses do not apply, the Court concludes Plaintiff Mid-Am is entitled to summary judgment on this claim.

Under Kansas law, "[w]hen a buyer of personal property fails to pay the agreed purchase price when due the seller may recover the agreed price of the goods with interest from the date payment was due until the proper amount is actually tendered to the buyer."[83] Here, the parties do not controvert that the amount Schmidt failed to pay Mid-Am on its open account totaled $455,739.49. Pursuant to D. Kan. Rule 56.1(a), "[a]ll material facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party." In addition, Fed. R. Civ. P. 56(e) states that if a party fails to properly address another party's assertion of fact required by Rule 56(c), the court may consider the fact undisputed for purposes of the motion. Accordingly, because Schmidt does not dispute this amount of damages, the Court finds that Mid-Am suffered $455,739.49 in damages on its action on account claim. The Court hereby grants Plaintiff Mid-Am's Motion for Summary Judgment as to Count I and finds that Mid-Am is entitled to a

---

[83] *Desbien v. Penokee Farmers Union Coop., Ass'n*, 552 P.2d 917, 924 (Kan 1976); K.S.A. § 84-2-709; *see generally Smyers v. Quartz Works Corp.*, 880 F. Supp. 1425, 1434 (D. Kan. 1995) (stating that K.S.A. § 84-2-709 "only applies '[w]hen the buyer fails to pay the price as it becomes due.'").

judgment in the amount of $455,739.49. Additionally, the Court hereby denies Defendants'

Cross-Motion for Summary Judgment on Plaintiff Mid-Am's action on account claim.

### D. Unjust Enrichment Claim Against Defendant Schmidt (Count IV)

Under Kansas law, the basic elements of an unjust enrichment claim are threefold:

> (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge of the benefit by the defendant; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value.[84]

Before examining the elements of an unjust enrichment claim, however, the Court must first

determine if the unjust enrichment doctrine is applicable to this case. "Kansas law is clear that

quasi-contractual remedies, such as unjust enrichment, 'are not to be created when an

enforceable express contract regulates the relations of the parties with respect to the disputed

issue.'"[85] Unjust enrichment, however, may "be available if the contract is void, unenforceable,

rescinded, or waived by the party seeking to recover.[86]

In this case, Mid-Am seeks an unjust enrichment claim against Schmidt for supplying

Schmidt with building products it requested without any receipt of payment. The Court

acknowledges that under the Federal Rules of Civil Procedure a party can seek relief in the

alternative to its other claims.[87] The Court, however, has concluded that there exists a written

contract between the parties relating to the disputed issue. In addition, Schmidt and the Duncans

fail to prove the affirmative defenses of impossibility and frustration of purpose to excuse their

---

[84] *J.W. Thompson Co. v. Welles Prods. Corp.*, 758 P.2d 738, 745 (Kan. 1988) (citations omitted).

[85] *Ice Corp. v. Hamilton Sundstrand Inc.*, 444 F. Supp. 2d 1165, 1170 (D. Kan. 2006) (citing *Britvic Soft Drinks, Ltd. v. ACSIS Techs., Inc.*, No. 01-2243-CM, 2004 WL 1900585, at *2 (D. Kan. June 8, 2004).

[86] *Id.*

[87] *Cohen v. Lockwood*, No. 02-2246-CM, 2003 WL 21384313, at *3 (D. Kan. June 12, 2003) (citing Fed. R. Civ. P. 8(a)) (stating "[t]he Federal Rules of Civil Procedure provide that 'relief in the alternative or of several different types may be demanded.'").

contractual obligation owed to Mid-Am. Accordingly, because a valid enforceable contract exists

between the parties regarding the disputed issue, Plaintiff Mid-Am's Motion for Summary

Judgment on its claim of unjust enrichment is denied.

### E.  Attorney's Fees, Collection Costs, and Interest on Unpaid Invoices

Mid-Am contends that, as a matter of law, it is entitled to recover attorney fees, collection

costs, and interest on unpaid invoices arising from claims of breach of contract, breach of

guaranty, and action on account. "Under Kansas law, the prevailing party in a lawsuit may

recover attorneys' fees where the fees are specifically authorized by statute or contract."[88] The

May 26, 2011 Credit Account Agreement provides for the payment of reasonable collection

costs, including attorney's fees.[89]

Additionally, in Kansas, when a rate of interest is specified in any contract, that rate

generally continues until full payment is made, including prejudgment and postjudgment.[90] The

Federal Rules of Civil Procedure also allow recovery of certain costs other than attorney's fees

for the prevailing party.[91] Pursuant to the terms of the agreements between the parties, any

overdue invoices were subject to late charges at the rate of 1.5% per month (18% per annum).

The contractual terms state that the costs of collection, including attorney's fees, were to be paid

by Schmidt and the Duncans. The Court finds Mid-Am is entitled to recover its costs of

collection, including reasonable attorney's fees, and prejudgment interest at the rate of 1.5% per

---

[88] *See Hartford Fire Ins. Co. v. P & H Cattle Co.*, 451 F. Supp. 2d 1262, 1284 (D. Kan. 2006) (citing *Missouri Pac. R.R. v. Kan. Gas & Elec. Co.*, 862 F.2d 796, 801 (10th Cir. 1988); *Oak Park Inv. Co. v. Lundy's Inc.*, 626 P.2d 1236, 1237 (Kan. 1981)).

[89] May 26, 2011 Credit Account Agreement at 2, ECF No. 31-1.

[90] K.S.A. § 16-205; K.S.A. § 16-201; *ARY Jewelers, L.L.C. v. Krigel*, 85 P.3d 1151, 1158 (Kan. 2004); *see Browning v. Cohen, McNeile & Pappas, P.C.*, No. 11-2611-EFM, 2012 WL 4210626, at *6-8 (D. Kan. Sept. 18, 2012).

[91] Fed. R. Civ. P. 54(d)(1).

month (18% per annum) until the amount owed is paid in full. The Court will conduct further proceedings to determine the proper amounts to be awarded.

### IV. Conclusion

In sum, the parties' motions for summary judgment are granted in part and denied in part as described above. For Count II, the Court finds that Defendant Schmidt breached the May 26, 2011 Credit Count Agreement with Mid-Am by not paying for the products it received. The Court, however, is unable to grant summary judgment on the issue of damages for Count II because there is a genuine issue of material fact as to the amount of damages suffered by Mid-Am. For Count III, the Court finds that the Duncans breached the terms of the guaranty. The Court, however, is also unable to grant summary judgment as to damages for Count III because there is a genuine issue of material fact regarding the amount of damages Mid-Am suffered from the underlying May 26, 2011 Credit Account Agreement between Mid-Am and Schmidt. For Count IV, the Court finds that Mid-Am's unjust enrichment claim asserted against Schmidt shall be denied as a matter of law because a valid enforceable contract exists between the parties. As to Count I – the action on account claim – the Court finds Mid-Am is entitled to judgment against Schmidt in the amount $455,739.49, plus interest at the rate of 1.5% per month. The Court will set this matter for further proceedings to determine the reasonable costs of collection, including attorney's fees, to be awarded in this case.

Accordingly,

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Summary Judgment (ECF No. 30) is granted with the exception of Count IV regarding Plaintiff's unjust enrichment claim which is denied. Defendants' Cross-Motion for Summary Judgment (ECF No. 35) is denied.

**IT IS FURTHER ORDERED** that Plaintiff Mid-Am is entitled to judgment against Defendant Schmidt on Plaintiff's action on account claim in the amount of $455,739.49, plus interest at the rate of 1.5% per month (18% percent per annum), and Plaintiff Mid-Am's reasonable costs of collection, including attorney's fees, such costs to be determined by a separate hearing.

**IT IS SO ORDERED.**

Dated this 29th day of March, 2013, at Topeka, Kansas.

_s/_ K. Gary Sebelius
K. Gary Sebelius
U.S. Magistrate Judge